10-25-19

Ms. Allison J. McCowan
Deputy Attorney General
Department of Justice
New Castle County
820 North French Street
Wilmington, Delaware 19801

      RE:    *Waters v. State of Delaware*
              *C.A. 18-266-RGA (U.S. District Court of Delaware)*

Dear Ms. McCowan:
    Please accept the attached report, which contains my expert opinions in the above case.

*[signature]*
Steve Ijames

Expert Report and Opinions

      RE:    *Waters v. State of Delaware*
                *C.A. 18-266-RGA (U.S. District Court of Delaware)*

My name is Steve Ijames. I have been retained by Ms. Allison J. McCowan to review the material provided in this case, and offer objective opinions concerning the interaction between Mr. Lionel Nathan Waters and members of the Delaware State Police, on December 20, 2015. I reached my conclusions by reviewing the material provided, and then drawing upon the totality of my knowledge, training, and approximately forty years of police experience. Upon this review and consideration, I offer the following opinions.

**Opinion 1:**

The decision to use the TASER and the manner of TASER use by Corporal Lloyd McCann against Mr. Lionel Waters was appropriate, not excessive, based on adequate cause, basis, and justification, and was consistent with contemporary police training, policy, and practice, and with that of a prudent and properly trained police officer facing these or similar circumstances.

**Basis for Opinion 1:**

Corporal McCann, Trooper Osgood, and Trooper Holt were sent to 607 Milford Harrington Highway, to serve a Protection from Abuse (PFA) warrant on Richard Wilson. McCann provided the following response to Captain Melissa Hukill's interview request that he (McCann) "take me through the incident".

LM: So when we arrived there it was myself, Trooper Osgood, Trooper Holl. Um we parked on the street; walked up the driveway. Trooper Holt and I went to the front of the residence and Trooper Osgood went to the back. Um, I began knocking on the front door; didn't get a response. Um, Trooper Holt was looking in the living room window and at some point while I was knocking, a unknown black female came out from what appeared to be the kitchen. Took like a step or two into the living room. She would knock on the door. He identified himself to her, asked her to come to the door she had knocked . So I walked over to the window as well to look in. I also observed this unknown black female open a door. Didn't know where it led to. Um from that doorway an unknown black male entered and walked out to the living room and immediately (cleared throat) approached the window where we were standing at. So we were talking through the glass to him. Obviously we identified ourselves. Um said we needed to speak with him, you know, I called him Richard because he matched the .. the picture I had looked up for the suspect we were looking for Dover. Um, he was very irate, argumentative, would not cooperate, would not come to the door, used a lot of profanity. When I, and again, identified myself, I continued to call him Richard because that's who I thought who he was. He said that wasn't his fucking name and he wouldn't give his name. So I said we'd have to obtain, you know, a search warrant or something if that was necessary. Again I walk away. At that point Trooper Osgood came around from the back of the house. So we all met up kind of in the grass between the driveway and the front of the house. As, like I said, we were walking away the front door opens. Start to turn around because we heard the noise, storm door opens and

2

this unknown black male who did not have a shirt on and he's in like black sweat pants, he said I have a weapon. So we immediately drew down; kind of panned out. So if you're looking at the front door of the residence, I was dead center of the sidewalk and the front door, probably about 12 to 15 feet away. Trooper Holl was to the left and Trooper Osgood was to my right. We kind of created like a fan affect and all three of us had our service weapons drawn. I began to give commands to the subject to drop the weapon. I could see that he had a black handgun behind his back. It was in his right hand and the barrel was sticking out the left side of his body. So, kind of by his hip so I could see the front two to three inches of the weapon and the top I saw the front sight; it was either red or orange. Um, again giving ... kept giving commands to put the weapon down. At some point he said, "all right, I'll put the weapon down". Never did. Again, gave him more commands to drop it. While the other two Troopers held lethal coverage at transition knowing that, either, this is going to escalate rather quickly and we could potentially get in a shootout with the subject. Didn't know who else was in the house. We knew that there was at least one other female. So, like I said, I transitioned, holstered my weapon while they kept lethal coverage, and drew my taser and immediately deployed it to on the suspect. It struck him, it was effective. He, his body tensed, brought the ... he ended up bringing the weapon around to the front of him and dropped it in the um ... he was in the doorway so it dropped to the porch right at the entrance way to the threshold to the house. He fell backwards into the residence. As we were closing our distance from our position to him, to the residence, he rolled to his back and began to sit up. I took it as he was potentially
reaching for the weapon. I again deployed my taser and let it ride for the five second course. Um, at that point, we were at the threshold of the doorway. I believe it was Trooper Holl kicked the weapon to the side and him and I entered the residence. We tried to take the suspect into custody and he was still actively resisting. At this point he was on his stomach laying on his hands trying to slide away. I again deployed my taser and we were able to take him into custody.[1]

Corporal McCann, Trooper Osgood, and Trooper Holt were interviewed and gave sworn depositions concerning their interaction with Mr. Lionel Nathan Waters, and all accounts corroborate the statement provided by McCann above.

In assessing whether the TASER force used and manner of force was consistent with contemporary and professional police practice, the totality of circumstances presented should be viewed in the context of the key factors referenced under *Graham v. Connor.*[2]
- **The severity of the crime involved**: The totality of circumstances outlined above indicate that the troopers were leaving a residence after attempting to serve a PFA warrant on a verbally abusive suspect who would not come to the door. As they were 12-15 from the front door the suspect opened it and stated that he had a weapon. A pistol was observed in the suspects hand, and the troopers drew their firearms and ordered the suspect to drop the gun-which he refused to do. A reasonable, prudent, and properly trained police officer facing these or similar circumstances would reasonably believe they were in imminent danger of death or serious physical injury.

---

[1] McCann statement to Captain Hukill, 10-29-15, page 4, paragraph 4
[2] https://supreme.justia.com/cases/federal/us/490/386/

3

- **The immediate threat to the safety of officers or others**: A reasonable, prudent, and properly trained police officer facing these or similar circumstances would reasonably believe they were in imminent danger of death or serious physical injury.
- **The suspect actively resisting seizure**: The troopers believed they were interacting with the wanted subject Richard Wilson, who was actively resisting seizure by the use of a firearm.
- **Rapidly evolving circumstances**: The totality of circumstances presented in this case are reflective of tense, uncertain, and rapidly evolving circumstances.

**TASER use**: In consideration of the circumstances outlined above, a prudent and properly trained police officer would have believed that the key factors in *Graham v. Connor*[3] had been met, and that it was appropriate to use force up to and including deadly force to address the imminent threat created by the suspect presenting at the door with a gun. McCann specifically referenced this during his interview:

LM: Um at the -- the initial taser deployment was to try and um an alternate method besides using deadly force which is why I transitioned to the taser.[4]

Accordingly, the use of lesser force-including a TASER-in an attempt to de-escalate the situation and avoid having to use deadly force was appropriate, consistent with contemporary police training, policy, and practice, and with that of prudent and properly trained officers facing these or similar circumstances.

**Manner of TASER use-aiming point**: Trooper McCann provided the following information concerning the aiming point used when he discharged the TASER:

LM: I transitioned, turned it on so a red light and the actually the device, the red dot was projected on his chest and shortly after that I tasered.[5]

TASER International and now AXON have provided cautionary language concerning aiming at the chest since November 2009. Accordingly, the chest should not be targeted absent circumstances that balance the need to stop the suspect behavior with the potential increase in risk. The troopers were facing a situation that almost certainly would have resulted in the police use of deadly force, unless the suspect was disarmed and taken into custody immediately. The TASER has generally proven effective when the device performs as intended with adequate probe spread. A key part of this effectiveness is ensuring both probes contact the suspect, which has proven difficult in many situations.[6] One way to increase the probability of both probes contacting the suspect from 12-15 feet is to use an aiming point that gives the bottom probe (which is angling down at 8 degrees) as long and wide a potential contact area as possible. Aiming at the chest from 12-15 feet would result in a probe spread of just under two feet, and the pelvic girdle would offer a

---

[3] https://supreme.justia.com/cases/federal/us/490/386/
[4] McCann statement to Captain Hukill, 10-29-15, page 15, paragraph 4
[5] Ibid page 13, paragraph 6
[6] https://www.apmreports.org/story/2019/05/09/when-tasers-fail

4

greater potential for the lower probe contact than the more common "split the belt line" aiming process, and hoping the bottom probe contacts the narrow thigh. Corporal McCann used the TASER to prevent having to use deadly force-but then only if the TASER worked and was effective at disarming the suspect. Accordingly, the decision to aim at the chest was appropriate based on the need to immediately disarm the suspect, and the chest aiming point increasing the chance of bottom probe contact and incapacitation.

**Manner of TASER use-cycles:** Corporal McCann cycled his M26 TASER three times, over the course of approximately 25 seconds.[7]

| 901 | 20 Dec 2015 22:37:22 | Trigger | 5 |
| 902 | 20 Dec 2015 22:37:27 | Trigger | 5 |
| 903 | 20 Dec 2015 22:37:47 | Trigger | 5 |

He provided the following information concerning the circumstances that resulted in him discharging his TASER three times during this interaction:

LM: Um at the -- the initial taser deployment (cycle 1) was to try and um an alternate method besides using deadly force which is why I transitioned to the taser. So he got the first deployment which was to resolve the whole situation, get him to drop the weapon, and us gain control. So the first deployment was, I could tell was an effective hit, because he tensed up, full body lock up and actually dropped the weapon. So when he fell back into the residence, you know, it's a five second burst, he was incapacitated. But after that five seconds, is when he rolled over and started to sit up. So again, we're not close enough. He would have ample time, the time between us getting there, you know him sitting up, he would be able to get to that weapon again. And like I said, he was taking a motion towards the threshold which is where the weapon was. So I, um, again tasered him - did a deployment ( cycle 2) and that was, you know, let that ride its course for five seconds. At that point we're in the threshold, the weapon was secured you know to the side of the doorway out of his reach and he could not gain control of that which is then when he, again, continued to actively resist. Didn't know if he had anything else on him, who else was in the residence, we heard the screaming. Again, instead of wrestling with him we did pull - I just deployed the taser again (cycle 3) which is when we gained full compliance.[8]

The manner of TASER use in the immediate case to incapacitate an armed suspect (cycle 1), to prevent the suspect from re-acquiring his firearm (cycle 2), and then to overcome active suspect resistance in an unsecured environment (cycle 3) would be consistent with contemporary and professional police training, policy, and practice. It would also be consistent with the Delaware State Police policy addressing the use of Conducted Electrical Weapons:

---

[7] McCann TASER download log, page 21
[8] McCann statement to Captain Hukill, 10-29-15, Page 15, paragraph 4

**EMPLOMENT/DEPLOYMENT**
A. A CEW may be used when it reasonably appears it will be the most effective force option, after consideration of the totality of the circumstances, to successfully attain lawful objectives.[9]

It is important to note that the download data indicates there was a very short delay (approximately one second) between the first and second TASER cycles. Contemporary police training and practice suggests that officers allow a reasonable amount of time between cycles for suspects to have the opportunity to comply with commands. The exception to this training and practice is when the circumstances demand immediate subject control-as in this case when the suspect is moving and in close proximity to a firearm.

In addition, the TASER use in this case was in compliance with the model policy from the International Association of Chiefs of Police (IACP). The IACP was founded in 1893, and is the largest and most respected police organization in the world-representing thousands of officers from over 100 countries. In 1987, the International Association of Chiefs of Police partnered with the Department of Justice and created the National Law Enforcement Policy Center (NLEPC). The NLEPC is made up of a diverse law enforcement advisory board and IACP staff, and with the input of leading subject matter experts they create model law enforcement policies that are reflective of contemporary police practice. The IACP National Policy Center model on the use of the TASER states (under section C-1):

C. Deployment 1. The Electronic Control Weapon is generally authorized to be used in circumstances where grounds to arrest or detain are present, and the subject's actions cause a reasonable officer to believe that physical force will be used by the subject to resist the arrest or detention. Such actions may include but are not limited to:
a. use of force against the officer or another person
b. violent, threatening, or potentially violent behavior
c. physically resisting the arrest or detention
d. flight in order to avoid arrest or detention, in circumstances where officers would pursue on foot and physically effect the arrest or detention.

I am the course developer and lead instructor for the IACP TASER instructor training program, the IACP subject matter expert on TASER, and the author of the IACP NLEPC model policy on Conducted Energy Weapons (TASER). I am also a past TASER master instructor. Accordingly, I familiar with and have in-depth knowledge of contemporary police TASER training, policy, and practice, and the circumstances and manner in which this technology would appropriately be used-as in the immediate case.

**Opinion 2:**
      The force used in this case was appropriate, based on adequate cause and basis, and was consistent with contemporary police training, policy, and practice. As such, it cannot be accurately characterized as an assault and battery.

---

[9] Delaware State Police CEW policy

**Basis for Opinion 2:**
Police officers are empowered to use reasonable force during the performance of their duties, to do a number of things including protect themselves and others, overcome resistance to arrest, and prevent a prisoner from escaping. In such circumstances the use of force is justified, and as such it is not an assault and battery.

**Opinion 3:**
The warrantless entry into the residence was appropriate, and consistent with contemporary police training, policy, and practice.

**Basis for Opinion 3:**
The troopers appropriately entered the suspect residence without a warrant based on exigent circumstances, specifically related to the need to provide immediate aid to the suspect, complete the arrest that was initiated at the open doorway, and conduct a protective sweep of the interior.

**Opinion 4:**
The arrest of Mr. Lionel Nathan Waters was based on adequate cause and basis, and was consistent with contemporary police training, policy, and practice.

**Basis for Opinion 4:**
Please see opinion 1 and the related basis above. Mr. Lionel Nathan Waters had reportedly been profane, uncooperative, and belligerent with troopers when they came to his residence. They believed that he was the wanted subject Richard Wilson, and upon interacting negatively with him through the window, advised Waters that they (the troopers) were going to obtain a search warrant. As the troopers were leaving, Mr. Waters opened his front door and advised the troopers that he "had a weapon", and a pistol was observed in his right hand. The troopers ordered Mr. Waters to drop his gun, but he refused to do so. The totality of these circumstances would have caused a reasonable, prudent, and properly trained Delaware police officer to believe that Mr. Waters was displaying a deadly weapon and intentionally placing the officers in fear of imminent physical injury. Accordingly, it would be appropriate to place Mr. Waters under arrest for that offense.[10]

**Opinion 5:**
The manner in which the troopers monitored Mr. Lionel Waters after his exposure to the TASER was consistent with agency policy, and consistent with generally accepted police policy and procedure, for officers facing these or similar circumstances.

**Basis for Opinion 5:**
The Delaware State Police policy addressing the use of Conducted Electrical Weapons addresses the procedure for post TASER use under the MEDICAL CONSIDERATIONS section as follows:

A. Following the use of a CEW, when a subject is brought under control, the subject shall be monitored for indications of medical problems as outlined in training.

---

[10] Delaware Code Title 11. Crimes and Criminal Procedure § 602.

B. A medical field evaluation will be conducted by the deploying employee on any subject to whom the CEW has been deployed. Should the employee observe any adverse effects, as outlined in training (i.e. profuse sweating during cold conditions, continued agitated state, labored/uncontrolled respirations, etc.), or the subject has received three (3) or more activations of the CEW, the employee shall seek medical treatment for the subject immediately.

The CAD data reflects the following key information concerning what the troopers on scene were reporting, and what time the dispatcher logged the activity on the log:
- "BLACK MALE ADVISES HE HAS A WEAPON WILL NOT SHOW HIS HANDS" (10:34:26)
- "TASER DEPLOYOMENT" (10:35:50)-The material reviewed indicates that Corporal McCann used the TASER to incapacitate and disarm the suspect (cycle 1), to prevent the suspect from moving in a way that appeared consistent with reaching towards the weapon (cycle 2), and to overcome physical resistance to control and facilitate handcuffing.[11]
- "REQ ADDITIONAL UNITS" (10:36:41)
- "REQ A 44" (ambulance at 10:36:50)
- "30'S BLACK MALE UNCON BUT BREATHING" (10:42:46). This request can be heard on McCann's MVR recording, with the video time showing this occurring at approximately 10:40:46 (two minute discrepancy)
- "S1344 (McCann) ADVISES NEED 44 10-18 (ambulance as quick as possible[12]) at 10:44:31 on the CAD report.
- "CPR in progress" at 10:45:50

Corporal McCann addressed what occurred following Mr. Waters being secured in handcuffs during his 12-29-15 interview with Captain Hukill:

"Put him in handcuffs. Heard a lot of screaming coming from the residence, um, it sounded like females. So Trooper Holl and Trooper Osgood went back to where the screaming was coming from and I stayed with the subject on the ground who was laying face down in ah handcuffs. He was still breathing. He had some blood coming from his face. They addressed the screaming. At that point Trooper Nefosky arrived. I advised him to secure the weapon in his vehicle and then come back. So, once he did that he stood with the subject. Um the suspect who was handcuffed on the ground while I went and cleared the rest of the kitchen, living room. Met up with Trooper Holl; cleared the basement. There was no one else in the residence. Turns out there was four subjects in that back bedroom that were screaming; there's two females, two male juveniles. Um, when we came back the suspect must, we determined you know the rest of the house was clear. Again, check his status. Um he was actively breathing it appeared. Rolled him to a recovery position on his right side. Still he was actively breathing. We started rolling him to his back. We checked for a pulse. At this point Trooper Rodriquez was there. Um, Harrington PD, and two of their officers, Milford Police had sent three or four, and a couple other Troopers had arrived. So, Trooper Rodriquez, Trooper Holl, Trooper Osgood and myself began checking

---

[11] McCann statement to Captain Hukill, 10-29-15, Page 15, paragraph 4
[12] McCann deposition page 132, lines 19-21

8

the suspect's vitals. Trooper Rodriquez advised there wasn't a pulse. We definitely began CPR. I requested an AED be brought up to the house. Trooper ah not Trooper Fral, Officer Fraley from the Harrington Police Department got his AED from his vehicle and brought it up. I took it out for him, applied you know, went to the thing, applied the pads to the suspect while they're still performing CPR. The AED advised to give a shock. I cleared the area, you know, went through that process. Did one shock with the AED. It advised to continue CPR. We did that. Prior to um, hooking the AED up to him we requested an ambulance be sent for the unresponsive subject. So once I did the shock and we did a couple more minutes of CPR. The ambulance had arrived and they took over the ... the first aid treatment and transported him to Milford Memorial."[13]

The totality of information reviewed indicates that Mr. Waters was continuously monitored by troopers after he was secured in handcuffs, an ambulance was called, and when it appeared he was in medical distress CPR was initiated and then followed by the application of an AED. This was consistent with agency policy,[14] and consistent with generally accepted police practice, policy, and procedure[15].

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions in this case. It is my expectation that additional information will be provided in this case. Accordingly, these opinions are preliminary and subject to modification, and made with a reasonable degree of professional certainty.

Steve Ijames

---

[13] McCann interview transcript, page 5
[14] Delaware State Police ECW policy, Medical Considerations "A"
[15] IACP model policy on ECW, D-post deployment considerations

9

Material reviewed:
- Complaint
- Answer
- Transcripts_20180417153904
- Supplemental Reports_20180417113844
- Supplement Reports_20180417121940
- Search Warrant SW Return_20180417122124
- Other Reports_20180417151002
- Other Agency Reports_20180417121810
- Miscellaneous_20180417130439
- Medical Records_20180417151616
- McCann's Interview Notes_20180417122333
- Introduction_20180417112905
- Firearm trace report
- Death certificate
- Criminal history
- Case notes
- Cad data
- Initial crime report
- Wisdom and Precious video interviews
- Osgood interview
- Nefosky interview
- McCann interview
- Holl interview
- Rodriquez interview
- TASER data
- Radio transmissions
- McCann MVR
- Latrice Waters interview
- Emails
- Photographs
- Depositions of McCann, Osgood, Holt,
- Baden report
- Leonesio report
- Autopsy report