# Expert Opinion Report

### By JOSEPH J. STINE

QUALIFICATIONS

I am the former Police Chief of New Britain Township Pennsylvania (1990 – 2000). I am the former executive officer of the Police Training Bureau for the City of Philadelphia. In my 25 years with the Philadelphia Police Department, I served in every rank from Patrolman through Inspector. I was a Detective for three years and the night command Captain in charge of the Detective Bureau for 2 years. I was a patrol district supervisor at the ranks of Sergeant, Lieutenant and Captain for 12 years. I am the former School Director for the Philadelphia Police Recruit Training Academy. I am currently certified as an instructor for Police training for the Commonwealth of Pennsylvania. I have developed and delivered training programs for the officers and supervisors of the Southeast Pennsylvania Transportation Authority Police Department.

I have been an adjunct faculty member in Criminal Justice Departments at Temple University, Holy Family College, Delaware Valley College and Philadelphia Community College.

I am a graduate of the Federal Bureau of Investigation National Academy and the Police Executive Research Forum. I graduated from St. Joseph University with a Master of Science Degree in Administration of Criminal Justice. I am a life member of the International Association of Chiefs of Police, where I served on the Education and Training Committee from 1991 through 2003.

I have been recognized as an expert in the training, practices and procedures utilized by the police in the performance of their duties. My expertise in these areas has been accepted in numerous state and federal courts as well as by the United States Court of Appeals for the Sixth Circuit.

A copy of my curriculum vitae has been previously provided.

1

I have been retained by the State of Delaware Department of Justice to review the case of and pertinent documents and materials relating to the matter of  Latrice Waters, Individually and as Personal Representative of the Estate of Lionel Nathan Waters, Deceased vs. State of Delaware Department of Public Safety, et al.  I now offer my expert opinion, to a reasonable degree of professional certainty, on the practices and procedures utilized. This opinion is based upon the review of the materials and information made available to me. In rendering this opinion, I have utilized my education and experience in law enforcement and academia.

I reserve the right to change or modify this opinion should additional facts, documents or evidence become available to me.

**MATERIALS AND DOCUMENTS REVIEWED:**

1. Complaint
2. Answer to Complaint
3. Initial Crime Report 03-15-083264
4. Delaware State Police Trooper Andrew Osgood's Supplemental Report
5. Delaware State Police Sgt. Cox's Supplemental Report
6. Delaware State Police Sgt. Lloyd Supplemental Report
7. Delaware State Police Trooper Brian Holl Supplemental Report
8. CAD Reports
9. Harrington Police Department Report
10. Radio Transmissions
11. Video recorded by Corporal Lloyd McCann's MVR
12. Handwritten Case notes
13. Criminal Record of Lionel Waters
14. Autopsy Report and Death Certificate
15. Fire Arms Trace on gun held by Lionel Waters
16. State of Delaware Department of Justice Report

2

17. Communications between the State of Delaware and Taser Int.

18. Taser Executive Summary

19. Interview Notes:

    A.  Delaware State Police Corporal Lloyd McCann Interview Notes

    B.  Delaware State Police Trooper Brian Holl

    C.  Wisdom Waters

    D.  Precyous Waters

20. Delaware State Police Trooper Corporal Lloyd McCann Use of Force Report

21. Transcript and Video of Delaware State Police Corporal Lloyd McCann's Interview 12-21-15

22. Transcript and Video of Delaware State Police Corporal Lloyd McCann's Interview 12-2915

23. Transcript and Video of Delaware State Police Corporal Sean Rodriquez' Interview

24. Transcript and Video of Delaware State Police Corporal Benjamin Nefosky's Interview

25. Video Interview of Delaware State Police Trooper Andrew Osgood

26. Handwritten interview notes Delaware State Police Trooper Andrew Osgood

27. Transcript and Video of Delaware State Police Trooper Andrew Osgood

28. Handwritten interview notes Delaware State Police Trooper Brian Holl

29. Video of Lionel Waters (Father of Lionel Nathan Waters)

30. Search Warrant Returns

31. DCH Medical Records

32. University of Pennsylvania Hospital Medical Records

33. Bay Health Medical Records

34. Handwritten interview notes

35. Depositions and Exhibits:

    A.  Avary Brown (Paramedic)

    B.  Chad Maris (Paramedic)

    C.  Dover PD Officer Chad Maris

    D.  Precyous Waters

    E.  Latrice Waters

    F.  Wisdom Waters

    G.  Trooper Andrew Osgood

    H.  Corporal Brian Holl

    I.  Corporal Lloyd McCann

    J.  Corporal Benjamin Nefosky

36. Michael Leonesio Report

37. Dr. Michael Baden Report 9-14-16

38. Dr. Michael Baden Report 9-3-19

The following are my expert opinions in the matter of <u>Latrice Waters, Individually and as Personal Representative of the Estate of Lionel Nathan Waters, Deceased vs. State of Delaware Department of Public Safety, et al.</u>

<u>Origin and Details of Underlying Complaint</u>

On December 20th, 2015 at approximately 10:40 PM the Delaware State Police (DSP) received a request for assistance from the City of Dover Police Department. That request was in the form of a call from the city of Dover Police Department to the Kent County Communication Center. The Dover PD dispatcher informed the Kent County Communication Center that there was an arrest warrant, for Criminal Contempt of a Domestic Violence Protective Order, for Richard Wilson. Mr. Wilson's address of record at the time was 607 Milford Harrington Highway, Milford, Delaware. 607 Milford Harrington Highway, Milford is located in an area that is covered by the Delaware State Police. (DSP)

It would later be determined that Mr. Wilson was a boarder at the home owned by Lionel Nathan Waters, a co-occupant. The City of Dover PD requested that the DSP go to that address, verify that Mr. Wilson lived there and, if they located him, take him immediately into custody for Criminal Contempt of a Domestic Violence Protective Order.

DSP Corporal McCann and Troopers Holl and Osgood were on duty, operating marked DSP vehicles and in full DSP uniform when they responded to that request for assistance. They arrived at 607 Milford Harrington Highway in separate vehicles and at approximately the same time. Corporal McCann and Trooper Holl went to the front of the house and Trooper Osgood went to the rear.  Corporal McCann went to the front door and knocked while Trooper Holl looked in the front window.

Trooper Holl observed a young female inside the house and she then disappeared from view. It would later be learned that, the female was Wisdom Waters and that she went into the basement to notify her father, Lionel Nathan Waters, henceforth referred to as Mr. Waters, that someone was knocking on the front door. Mr. Waters bedroom was in the basement of the house. Mr. Waters armed himself with a .380 semiautomatic handgun and went up the stairs.

When Mr. Waters arrived on the first floor the DSP troopers did not know that Mr. Waters was armed with a gun. A verbal exchange between Mr. Waters and the DSP troopers ensued. At the onset of this exchange the DSP troopers immediately identified themselves. The DSP troopers thought that Mr. Waters was, in fact, Mr. Wilson. They informed Mr. Waters that they had an arrest warrant for Mr. Wilson.

Mr. Waters questioned the propriety of the DSP troopers being at his door. He informed them that he was not Richard (Mr. Wilson). He informed them DSP troopers that he would not comply with and/or cooperate with their efforts to gain entry to the house to search for Richard Wilson and/or come out of the house to talk to them.

Throughout this verbal confrontation the DSP troopers continued to be unaware that Mr. Waters was armed with a gun. Faced with Mr. Waters refusal to cooperate and/or assist in their attempts to locate and arrest Mr. Wilson and operating under the belief that Mr. Waters was Mr. Wilson, the DSP troopers decided to secure the residence and go get a search warrant for the residence.

Trooper Osgood joined Trooper Holl and Corporal McCann at the front of the house. The three of them turned their backs to the house. They started to walk away with the intention of

applying for a search warrant. Without any encouragement or direction from the DSP, Mr. Waters chose this moment to open his front door, step partially out of the house and inform the DSP troopers that he was armed. The uniformed DSP troopers these actions and words by Mr. Waters as a threat to their safety. In response to that threat, they immediately spread out, turned to face Mr. Waters and drew their department issued pistols. While doing this Corporal McCann called Kent County Communications and asked for them to clear the air, indicating that he had an emergency situation.

Trooper Osgood was able to visually confirm that Mr. Waters did, in fact, have a gun in his hand. Trooper Osgood informed Corporal McCann and Trooper Holl that he had verified that Mr. Waters was armed with a gun.

The DSP troopers loudly and repeatedly ordered Mr. Waters to drop the gun. Mr. Waters did not comply and stated that he would not drop the gun. It should be noted that, it was later determined, Mr. Waters' BAC was almost 3 times the legal limit at the time.  During this encounter the troopers and Corporal were approximately 15 to 20 feet away from Mr. Waters. After several verbal attempts to have Mr. Waters drop the gun Corporal McCann holstered his pistol and drew his department issued Taser. After another order to drop the gun and another refusal, Corporal McCann deployed the Taser in the probe method. The probes made contact and lodged in Mr. Waters' chest and groin area.

The deployment seemed to be at least partially successful and Mr. Waters dropped the gun and fell to the ground, with his feet still partially outside of the house. As the officers approached Mr. Waters to secure the gun and place him in handcuffs, Mr. Waters attempted to reach for the gun.

In response to Mr. Waters attempt to reacquire the gun Corporal McCann reactivated the Taser. This 2nd activation allowed the troopers to approach Mr. Waters and kick the gun out of the way. When the troopers attempted to handcuff Mr. Waters he resisted being placed in handcuffs and Corporal McCann activated the Taser for a 3rd time. The 3rd activation allowed the officers to place Mr. Waters in handcuffs.

As this was occurring the corporal and the troopers heard loud screaming coming from the rear interior of the house. As soon as Mr. Waters was handcuffed Corporal McCann and Trooper Holl went to investigate the source of the screaming and clear the house.

Trooper Osgood remained with Mr. Waters who appeared to be unconscious and breathing. EMS was called to the scene check on Mr. Waters' wellbeing and to remove the probes from Mr. Waters' skin. As the house was being cleared additional DSP personnel and officers from other jurisdictions arrived on the scene.

Trooper Rodriquez was among those who responded after Mr. Waters was placed in handcuffs. When Trooper Rodriquez approached Mr. Waters, he saw that Mr. Waters appeared to have stopped breathing. Trooper Rodriquez initiated CPR and EMS was notified to respond in an expedited manner. The AED was retrieved from a DSP vehicle and Mr. Waters was hooked up the AED. When the AED signaled that Mr. Waters should be shocked, he was given a shock. EMS arrived on the scene and took over the medical care of Mr. Waters.

Mr. Waters was transported by ambulance to the nearest hospital and when Mr. Waters arrived at the hospital, he had a heartbeat. Those who came in close contact with Mr. Waters during these attempts supply medical attention noticed that there was a strong odor of alcohol emanating from him. DSP personnel remained at the scene for several hours after Mr. Waters was taken to the hospital. Later that morning, Mr. Wilson was arrested at 607 Milford Harrington Highway when he returned to his residence there.

On January 9th, 2016 Mr. Waters passed away.

**Opinions**

#1.

The coordinated attempt, by the DSP and City of Dover PD, to serve the arrest warrant, for Criminal Contempt of a Domestic Violence Protective Order, for Richard Wilson, was in accord with generally accepted practices and procedures for professional law enforcement agencies.

It has long been recognized that criminals are not constrained by the boundary lines of the multitude of boundary lines that define local policing in the United States. In order to address these jurisdictional concerns Professional law enforcement agencies have adopted various practices and procedures. These practices include but are not limited to having agencies outside of the jurisdiction of the originating agency serve arrest warrants for persons who have left the jurisdiction where the criminal activity occurred.

In this matter there was a warrant for Criminal Contempt of a Domestic Violence Protective Order, for Richard Wilson. This criminal contempt had occurred in the City of Dover. An investigation into Mr. Wilson divulged that his address of record was 607 Milford Harrington Highway, Milford, Delaware. This address was determined to be outside of the jurisdiction of the Dover PD and in a jurisdiction that is patrolled by the DSP. In accordance with generally accepted practices and procedures the Dover PD asked for and received the assistance of the DSP in the service of this warrant.

The nature of the offense that caused the warrant to be issued was Criminal Contempt of a Domestic Violence Protective Order. Professional law enforcement agencies and their officers training and experience teaches them that every effort must be made to promptly and expeditiously serve this type of warrant. The annals of criminal justice history are replete with tragic outcomes when this type of warrant is not promptly and expeditiously served.

Professional law enforcement officers training and experience teaches them that the victims of these violations are in greater danger when the perpetrators of these violations become aware that victim has reached out to the police for help. Professional law enforcement officers know that these victims are best protected when the violator has been arrested.

In this matter the DSP received the call to assist the Dover PD and they immediately went to 607 Milford Harrington Highway, Milford, Delaware, his address of record, to arrest Richard Wilson.

#2.

DSP Corporal McCann and Troopers Holl and Osgood were in accord with generally accepted practices and procedures for professional law enforcement officers when they knocked on the door of the residence at 607 Milford Harrington Highway at approximately 11:00 PM in an effort to take Richard Wilson into custody.

Professional law enforcement officers training and experience teaches them that in most cases a special night time warrant must be issued in order to conduct a night time search.

The DSP personnel who knocked on the door of 607 Milford Harrington Highway were not there to conduct a search of the property. They were there to serve a warrant for the arrest Mr. Wilson. Because of the nature of that crimes Mr. Wilson was alleged to have committed (see opinion #1) that warrant had to be served as expeditiously as possible.

#3.

DSP Corporal McCann was in accord with generally accepted practices and procedures for professional law enforcement officers when he attempted to talk Mr. Waters into cooperating with the efforts to serve the arrest warrant for Mr. Wilson, who lived at 607 Milford Harrington Highway.

Professional law enforcement officers training and experience teaches them that the majority of arrests are carried out with the cooperation of the persons being arrested and/or persons who have knowledge of that person's whereabouts. These arrests are the result of a law enforcement officers' verbally informing the person who is to be arrested and/or persons with knowledge of that person's whereabouts that a warrant for the arrest of that person exists. These arrests of cooperating persons are carried out with little or no force being used

9

In this matter DSP Corporal McCann attempted to solicit the cooperation of Mr. Waters. He identified himself as a DSP officer. He was in full uniform. He told Mr. Waters why he was there.

Mr. Waters refused to cooperate with the police. He was argumentative and combative. He refused to let the DSP officers into his house. He refused to comply with the DSP officers request to open the door and talk with the DSP officers.

In response to Mr. Waters failure to cooperate, Corporal McCann realized that he was going to have to get a search warrant that would allow him to enter 607 Milford Harrington Highway with or without the permission of Mr. Waters,

#4.

DSP Corporal McCann was in accord with generally accepted practices and procedures for professional law enforcement officers when he initiated steps to secure 607 Milford Harrington Highway until a search warrant could be obtained,

Professional law enforcement officers training and experience teaches them that when a person is inside of their home and fails to cooperate with the service of an arrest warrant it is a good practice to present the facts to a neutral arbiter of facts and ask that a search warrant be issued. That same training and experience teaches a professional law enforcement officer that it takes at least a few hours to secure a warrant. Experience teaches a professional law enforcement officer that if they leave the premises there is a great likelihood that the wanted person will flee. In order to prevent that from happening, the generally accepted practice is to secure the property, from the outside.

In tis matter Corporal McCann was in the process of initiating steps to secure 607 Milford Harrington Highway while he applied for a search warrant. He and the troopers were walking away from the property and Corporal McCann was about to arrange for the property to be secured.

#5.

DSP Corporal McCann and Troopers Holl and Osgood were in accord with generally accepted practices and procedures for professional law enforcement officers when they turned, spread out and drew their department issued pistols to address the threat posed by Mr. Waters. When he opened the door and announced that he had a weapon.

Professional law enforcement officers training and experience teaches them that when they are threatened by an armed adversary, they need to take immediate action to protect themselves. They know that they are issued firearms to protect themselves and others from death and /or serious bodily injury.

It is my opinion that when Mr. Waters unilaterally introduced a firearm into what had been merely a verbal exchange these officers would have been acting in accordance with generally accepted practices when they turned to face that threat. Given the sudden and unprovoked introduction by Mr. Waters of a firearm, into what had been a heretofore peaceful exchange of words, it would have been incumbent on DSP Corporal McCann and Troopers Holl and Osgood to take steps to protect and defend themselves. The single most effective way to protect themselves under the circumstances created by Mr. Waters would have been to draw their guns so that they could be prepared to defend themselves.

It is further my opinion that given this unprovoked and unilateral escalation by Mr. Waters these officers would have been in accord with generally accepted practices and procedures if they had used deadly force to address the threat posed by Mr. Waters and the gun in his hand.

#6.

Trooper Osgood was in accord with generally accepted practices and procedures for professional law enforcement officers when he verified that Mr. Waters was armed and then let Trooper Holl and Corporal McCann know that he had seen the gun in Mr. Waters hand.

Professional law enforcement officers training and experience teaches them that whenever possible they should verify important information, like whether or not a person is

armed, by personal observation. That same training and experience teaches them that it is imperative for an officer who observes a gun to loudly and clearly relay that information to all other officers on the scene.

In this case Trooper Osgood moved into a position where he could see Mr.  Waters hand. From that position Trooper Osgood was able to verify that Mr. Waters was armed with a gun. When Trooper Osgood made that observation he immediately conformed with generally accepted practices and informed Corporal McCann and Trooper Holl that Mr. Waters was holding a gun in his hand.

#7.

Corporal McCann was in accord with generally accepted practices and procedures for professional law enforcement officers when he exposed himself to the danger of death or serious bodily injury by repeatedly ordering Mr. Waters to drop the gun. It is further my opinion that he was in accord with generally accepted practices and procedures when exposed himself to danger of death and/or serious bodily harm by holstering his pistol, drawing and deploying his department issued Taser.

Professional law enforcement officers training and experience teaches them that the most effective and safest way, for an officer who is confronted with an armed adversary, to protect himself and others is to use deadly force to incapacitate that adversary.

In this matter Corporal McCann and Troopers Holl and Osgood chose to accept the risk and put their lives in danger by attempting to persuade Mr. Waters to drop the gun. Mr. Waters had been uncooperative and confrontational during the verbal exchange that occurred while Mr. Waters was still inside of the house.

Mr. Waters sudden appearance in the open doorway while holding a gun in his hand and announcing that he was armed was an immediate threat to the officers' safety. In an attempt to resolve the deadly force encounter, created by Mr. Waters, without resorting to the use of deadly force, the DSP officers allowed the threat to continue while attempting to talk Mr. Waters into dropping the gun.

When Mr. Waters refused to drop the gun the deadly force threat that was posed to Corporal McCann and Troopers Holl and Osgood continued.

It is my opinion that Corporal McCann accepted the risk to his own life. He made the decision to attempt to use less deadly force, the Taser, to address the threat of Mr. Waters confronting them while armed with a gun. By utilizing the Taser Corporal McCann was attempting to use less deadly force to confront the deadly force threat posed by a person armed with a gun.

#. 8

Corporal McCann was in accord with generally accepted practices and procedures for professional law enforcement officers when he deployed the Taser in probe mode and activated it three times.

Professional law enforcement officers training and experience teaches them that, in situations in which the actions of a person or persons being taken into custody and/or investigated make it necessary for the officer to use force, officers often have many use of force options available to them. In situations where an officer is confronted with a person who is a threat to cause the death of and/or serious injury to the officer, the officer is justified in using deadly force to address that threat. While the use of deadly force is justified, it is not mandated and individual officers have the discretion to place themselves at greater risk and use lesser force if they believe it is appropriate.

In this matter Corporal McCann choose to use the Taser instead of his service pistol to address the deadly force threat presented by Mr. Waters. The Taser is a considered to be a less deadly use of force because in the overwhelming number of instances where it is used it merely causes the threatening person to become temporarily incapacitated. During that temporary incapacitation, officers are often able to place the threatening person in restraints.

The use of the Taser in a situation like the one confronting Corporal McCann and Troopers Holl and Osgood exposed them to an elevated level of risk. The Taser only works when both probes make good contact. These probes are released through the use of pressurized gas that propels the probes toward the targeted person. The Taser is not a ballistically sound weapon.

13

There is no barrel. The probes are designed to travel on divergent trajectories. The desired temporary incapacitation occurs as the result of an electrical current being sent from a battery over thin breakable wires.

There are many things that can and do prevent a successful deployment. Because the probes are propelled by compressed gas the speed at which they travel is slow enough where movement by the threatening person can cause them to miss their mark. The wire or wires can break. The probe or probes can fail to make good contact. The probe can be removed by the threatening person. In some instances, the electrical current just fails to incapacitate the threatening person.

 If any of these things occur the officer is left exposed to the deadly threat with his/her gun holstered.

In this matter, the initial deployment of the Taser was done from a distance of 15 to 20 feet and appeared to be effective. It caused Mr. Waters to drop the gun and fall to the ground. This allowed Troopers Holl and Osgood to move forward. It was their intention to secure the gun and place Mr. Edwards in restraints.

Before the Troopers could get in position to secure the gun and handcuff Mr. Waters, he reached for the gun that was lying next to his feet. This made it necessary for Corporal McCann to reactivate the Taser. The temporary incapacitation that followed this activation allowed Trooper Osgood to remove the gun. When Troopers Osgood and Holl attempted to handcuff Mr. Waters, he resisted their attempts to place him in handcuffs. This resistance made it necessary for Corporal McCann to activate the Taser for a 3rd time and this allowed Troopers Osgood and Holl to place Mr. Waters in handcuffs.

It is my opinion that based on the actions of Mr. Waters each of these activations was in accord with generally accepted practices and procedures for professional law enforcement officers.

#. 9

Corporal McCann and Trooper Holl were in accord with generally accepted practices and procedures for professional law enforcement officers when they went to check out and secure the rest of the house.

Professional law enforcement officers training and experience teaches them not to assume that there is only one threat in a house. That same training and experience teaches them that when they hear screaming and yelling coming form another part of a house it would be their duty to promptly check out the source of and reason for that screaming and yelling.

In this matter Mr. Waters had initially told the DSP personnel that he was not Richard Wilson. If he was telling the truth that meant that the subject of the warrant was still unaccounted for. In addition, one person from the house had just confronted uniformed members of the DSP with a loaded handgun. It would have been fool hardy, dangerous and contrary to generally accepted practices and procedures for Corporal McCann and Trooper Holl not to check out the rest of the house.

In this matter, in addition to the potential threat of another potentially armed person or persons in the house, there was the fact that screaming and yelling was coming from inside the house. It would have been the officers' duty to find out the source of and reason for that screaming and yelling.

#. 10

The DSP personnel on the scene were in accord with generally accepted practices and procedures for professional law enforcement officers when they called for EMS personnel to come to the scene to check on the wellbeing of Mr. Waters and remove the Taser probes.

Trooper Osgood was in accord with generally accepted practices and procedures for professional law enforcement officers when he made sure that Mr. Waters was on his side and breathing.

Trooper Rodriquez was in accord with generally accepted practices and procedures for professional law enforcement officers when he noticed that Mr. Waters did not appear to be breathing and he initiated CPR and later utilized the AED device.

Professional law enforcement officers training and experience teaches them that after a person has been tased it is recommended that the person be checked out by medical professionals. The medical professionals can remove the probes, check to see if there were any injuries sustained by the person who had been tased. In addition, they can address any medical issues that may arise.

Law enforcement officers are trained to place unconscious and/or intoxicated persons on their side while awaiting the arrival of the trained medical professionals.

In this matter Mr. Waters was observed to be unconscious and breathing the DSP personnel placed him on his side to facilitate continued breathing. It was later determined that Mr. Waters BAC was nearly 3 times the legal limit.

#11.

The DSP personnel on the scene were in accord with generally accepted practices and procedures for professional law enforcement officers when initiated CPR when Mr. Waters appeared to stop breathing and utilized the AED when the machine indicated a shock was appropriate.

Professional law enforcement officers training and experience teaches them that on many occasions they will be required, to transition from the role of apprehending and /or defending themselves from a person who has posed a deadly threat to being a first responder to that same person who becomes in need of medical attention. That training and experience teaches them to place a person on their side so that an open airway can be maintained. It teaches them to call for EMS personnel to come to the scene when needed. It teaches them to monitor the person to make sure that they are breathing and standby until EMS personnel arrive on the scene. It teaches them to initiate CPR only if the person stops breathing. It teaches them to utilize

an AED devise when appropriate. It teaches them to request an expedited response from EMS when the person stops breathing.

In this matter Mr. Waters had just been a deadly threat to the officers. His actions had made it necessary for the officers to use what they believed to be less deadly force to address that threat. After being Tased Mr. Waters went unconscious. At that point, the officers became the first responders to a possible medical emergency. In accordance with their training and experience the DSP personnel called for EMS to respond to the scene. While waiting for EMS to arrive the DSP personnel monitored Mr. Water's breathing and placed him on his side to facilitate breathing. When the DSP personnel noticed that Mr. Waters appeared to have stopped breathing the DSP personnel on the scene-initiated CPR. In compliance with their training and experience they brought an AED device to Mr. Waters' side in anticipation of the possibility they might have to use it. When the device indicated that it was appropriate to shock Mr. Waters the DSP personnel utilized the AED.

All of the opinions I have offered in this report are to a reasonable degree of professional certainty. Those opinions are based on the data listed in the Materials and Documents Reviewed section of this report. In forming these opinions, I have also relied on the knowledge and experience that I have accumulated in more than 50 years as a police officer, police supervisor and police trainer. In addition, I have utilized my education and training in the field of law enforcement and from the world of academia to guide me in the formation of these opinions.

/s/ *Joseph J. Stine*

Joseph J. Stine October 30, 2019