IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LATRICE WATERS, | |
| Plaintiff, | |
| v. | Civil Action No. 18-cv-266-RGA |
| STATE OF DELAWARE, DEPARTMENT of PUBLIC SAFETY, LLOYD McCANN, ANDREW OSGOOD, and BRIAN HOLL, | |
| Defendants. | |

<u>MEMORANDUM</u>

Before me is Defendants' motion for summary judgment on Plaintiff's civil rights claims under 42 U.S.C. § 1983 and several state law claims. (D.I. 74). Plaintiff opposes this motion. (D.I. 82). Plaintiff has also filed a motion to exclude two of Defendants' expert witnesses. (D.I. 78). Defendants oppose this motion. (D.I. 84). Defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's motion to exclude Defendants' expert witnesses is denied. Defendants are granted leave to amend their expert witness reports.

## I.       BACKGROUND

Defendants, Delaware State Troopers Lloyd McCann, Andrew Osgood, and Brian Holl, were dispatched to a residence in Milford, Delaware on the night of December 20, 2015. (D.I. 76 at A11-A12). Defendants were assisting the Dover Police Department in locating Richard Wilson, an individual with an active warrant. *Id*. The warrant was issued for a protection from abuse order violation. *Id*. After identifying themselves and knocking on the door, an individual – later identified as Lionel Waters – appeared at a window. (*Id*. at A16-A18). Mr. Waters refused to identify himself and had a "hostile" exchange with Defendant McCann. *Id*. As the

troopers started walking away, possibly to obtain a search warrant, Mr. Waters opened the door, and stated, "Excuse me, I have a gun." (*Id*. at A19-A20, A147).

Defendants drew their service weapons and Defendant McCann noticed Mr. Waters had a handgun behind his back. (*Id*. at A21-A22). Mr. Waters was "told multiple times to put the weapon down," but "he never did." (*Id*. at A23). After an amount of time described as between twenty and thirty seconds by Defendant Osgood, Defendant McCann holstered his firearm, drew his taser, and deployed it at Mr. Waters. (*Id*. at A23-A24, A88). Mr. Waters fell into the residence and the gun landed near his feet. (*Id*. at A25). After the first five-second taser cycle, Mr. Waters began to sit up. (*Id*. at A25, A90, A151). Defendant McCann "felt as though he was reaching for the handgun," so he reactivated the taser for a second five-second cycle. *Id*. Defendants Osgood and Holl were on the porch and approximately two feet away from Mr. Waters when the second taser cycle was activated. (*Id*. at A151). Following the second burst, Defendants Osgood and Holl moved toward Mr. Waters to secure him. (*Id*. at A90-A91). Defendant Osgood first swept the gun under the rug, then helped Defendant Holl secure Mr. Waters. (*Id*. at A92-A93). Mr. Waters was secured in "five to ten seconds" after Defendants Osgood and Holl first put their hands on him. (*Id.* at A94). No taser cycle was active when Mr. Waters was in the process of being secured. (*Id*. at A95). Mr. Waters was not "actively resisting arrest" or "thrashing about." (*Id*. at A93-A94). After Mr. Waters was secured, Defendants Osgood and Holl "immediately" went to secure the house after hearing screaming inside. (*Id*. at A97, A151).

The circumstances of the third taser burst are less clear. After the second taser burst, Defendant McCann noticed Mr. Waters "began to move somehow" with the gun still unsecured, and Defendant McCann activated the taser for a third time. (*Id*. at A26). Defendant McCann

"believe[d]" the handcuffs were placed on Mr. Waters after burst three but could not recall.  *Id.*
As evidenced by the Taser Report, twenty seconds passed between the starts of the second and
third taser bursts.  (D.I. 83 at PA36).  The Taser Report, which was downloaded the
night/morning of the incident, shows when each taser activation occurred.  (D.I. 82 at 4).

Before Defendant McCann also began searching the house, Mr. Waters' breathing was
"normal."  (D.I. 76 at 29).  Another officer – not a defendant in this case – watched Mr. Waters
as Defendant McCann went to search part of the house.  (*Id*. at A30).  At some point after
securing the home, Defendant McCann noticed Mr. Waters' breathing was "labored."  *Id*.  After
calling for an ambulance, the officers on the scene performed CPR and used an automatic
external defibrillator ("AED").  (*Id*. at A31-A34, A99).  Mr. Waters was in cardiac arrest by the
time the EMTs arrived.  (D.I. 83 at PA2).  Mr. Waters never regained consciousness and died
nearly three weeks later.  *Id*.

Plaintiff filed this civil rights and tort action in Delaware Superior Court, and the case
was removed to this Court on February 15, 2018.  (D.I. 1). The operative complaint is an
amended complaint filed on September 26, 2019.  (D.I. 68).   This Court has jurisdiction over the
matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367(a).  There are three
federal causes of action under 42 U.S.C. § 1983 (denominated as the second, fourth, and sixth
causes of action).  There are four state law causes of action: wrongful death, gross or wanton
negligence, battery, and loss of consortium (denominated as the first, eighth, eleventh, and

thirteenth causes of action).[1]  Defendants now seek summary judgment on the civil rights and most of the state law claims.

## II.     LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact is one that "may reasonably be resolved in favor of either Party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 259 (1986).  The moving party bears the initial burden of demonstrating the absence of material issues of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992)).  Summary judgment should be granted if the Court finds, in consideration of all the evidence, that no reasonable trier of fact could find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 588 (1986).

## III.    DISCUSSION

### A.  Civil Rights Claims

Plaintiff pleads three § 1983 claims against Defendants McCann, Osgood and Holl: (1) excessive force for the use of the taser; (2) false arrest; and (3) deliberate indifference to medical needs.  Defendants contend that they are entitled to qualified immunity for these civil rights claims.

---

[1] The amended complaint also has a ninth cause of action captioned as intentional infliction of emotional distress, but no text accompanies the cause of action.  I do not think, therefore, that such a count is actually pled.  During oral argument, Plaintiff did not try to revive it.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To evaluate qualified immunity, a court must decide two issues: (1) whether the facts that a plaintiff has shown make out a violation of constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct.  *Id.* at 232.  Existing precedent must place "the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

The Third Circuit has recently emphasized two rules that district courts must follow during a qualified immunity analysis.  *See Williams v. City of York, Pennsylvania*, ___ F.3d ___, 2020 WL 4249437 at *3-4 (3d Cir. July 24, 2020).  First, it is crucial for a district court to "analyze separately, and state findings with respect to, the specific conduct of each [defendant]." *Grant v. City of Pittsburgh*, 98 F.3d 116, 126 (3d Cir. 1996).  This rule ensures that a plaintiff establishes the "personal involvement" of each defendant in order to survive summary judgment. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018).  As a second rule, a district court must also "specify those material facts that are and are not subject to genuine dispute and explain their materiality.*" Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 146 (3d Cir. 2002).

### 1. Excessive Force Claim

Claims that law enforcement officers have used excessive force are analyzed under the Fourth Amendment and its reasonableness standard.  *Damiani v. Duffy*, 277 F. Supp. 3d 692, 703 (D. Del. 2017), *aff'd,* 754 F. App'x 142 (3d Cir. 2018).

In the complaint, Plaintiff alleged the excessive force allegations against all three Defendants.  (*See* D.I. 68 ¶ 66).  However, at oral argument, Plaintiff conceded that the excessive

force claim cannot be pursued against any Defendant other than McCann.  This concession accords with the evidence, as Defendant McCann, and not the other two officers, activated all three taser bursts.  Summary judgment on the excessive force claim is therefore granted for Defendants Osgood and Holl.

Defendants argue that the taser use was lawful and in accordance with clearly established law.  (D.I. 75 at 15).  As they note, this was a "highly volatile and quickly evolving situation" without any evidence that contradicts Defendants' testimony.  *Id*.  Defendants contend they were confronted with a "hostile," armed individual who did not drop his weapon.  *Id*.  Defendants assert this situation reasonably caused officers concern for their own safety.  *Id*.  They argue there is "no case that suggests that using a Taser on an agitated, armed individual who is failing to obey lawful orders is an excessive use of force."  (*Id*. at 15-16).

Plaintiff argues that Mr. Waters did not make any threatening statements or movements.  (D.I. 82 at 9).  Further, Plaintiff asserts Mr. Waters was unable to drop his weapon before Defendant McCann deployed his taser.  *Id*.  Plaintiff contends that both the first and second shocks were not justified, but even if they were, the third shock was an excessive use of force.  (*Id*. at 10).  Plaintiff argues that the testimony of Defendants shows Mr. Waters was compliant after the second shock and no longer resisting arrest.  *Id*.  "[U]nder long-established Fourth Amendment law, force may not legitimately be used against an individual who is compliant and poses no ongoing threat to himself or others, or who is not resisting arrest, even if he was initially non-compliant."  *Anthony v. Seltzer*, 696 F. App'x 79, 82 (3d Cir. 2017).  This principle extends to the use of tasers.  *Id*.

For an alleged civil rights violation involving deadly force, "courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the fact that the witness

most likely to contradict his story . . . is unable to testify.'" *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) (quoting *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994)).  A court must also "look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably."  *Id.* (quoting *Scott,* 39 F.3d at 915).

Here, I agree with Defendants that the undisputed record evidence is that the first two taser activations were constitutionally reasonable.  "[C]ourts had held that the use of a taser on an individual who disobeys an officer or actively resists an officer's commands is constitutionally reasonable."  *Randolph-Ali v. Minium*, 793 F. App'x 146, 150 (3d Cir. 2019).  After telling Defendants that he had a gun, Mr. Waters was "told multiple times to put the weapon down," but "he never did."  (D.I. 76 at A23).  Thus, it was constitutionally reasonable for Defendant McCann to use a taser in this instance.  Plaintiff asserts the taser deployment was "immediate" and did not give Mr. Waters a chance to drop the weapon.  (D.I. 82 at 9; D.I. 76 at A23-A24).  However, the evidence for this argument is a statement taken out of context.  The time between Defendant McCann drawing his taser and deploying it was "immediate," but Defendants were already ordering Mr. Waters to drop his weapon for some unknown time period that was probably about a minute.  (*See* note 6 *infra*; *see also* D.I. 76 at A23).  Therefore, Plaintiff is wrong to assert that there is evidence that Mr. Waters was not given a chance to drop his weapon before the taser deployment.  After the first deployment ended, Mr. Waters sat up and Defendant McCann "felt as though he was reaching for the handgun."  (*Id*. at A25).  Tasering Mr. Waters a second time was also constitutionally reasonable.

Plaintiff further contests that Mr. Waters was a threat by the time Defendant McCann initiated the third taser burst.  (D.I. 82 at 9-10).  As the Third Circuit recently stated, the law is

clear that it is "unlawful to use a taser on an individual who is nonviolent, compliant, and poses no threat of danger." *Randolph-Ali*, 793 F. App'x at 150.  When viewing the evidence in the light most favorable to Plaintiff, a genuine issue of material fact remains as to the circumstances and reasonableness of the third taser activation.  According to Defendant McCann, before burst three, Mr. Waters "began to move again" with the gun still unsecured at his feet.  (D.I. 76 at A26).  Defendant McCann could not recall whether Mr. Waters was handcuffed by the third taser deployment.  *Id.*  However, Defendant Osgood only recalled witnessing the first two taser activations.  (*Id.* at 98).  Defendant Holl initially thought he witnessed two bursts, but "with the benefit of hindsight," believes he witnessed a third.  (*Id.* at A153).  After the second taser activation, Defendant Osgood "went forward to get [Mr. Waters] into custody" and swept the gun under a rug.  (*Id.* at A92).  Defendant Osgood stated Mr. Waters was not "actively resisting arrest" or "thrashing about."  (*Id.* at A94).  After being two feet away from Mr. Waters during the second taser deployment, Defendants Osgood and Holl secured Mr. Waters in "five to ten seconds" from the time they put their hands on him.  (*Id.* at A94, A151).  After Mr. Waters was secured, Defendants Osgood and Holl immediately went to secure the house after hearing screaming inside.  (*Id.* at A97).  The Taser Report shows that fifteen seconds passed between the end of the second and the start of the third taser activations.  (D.I. 83 at PA36).

The timeline created by Defendant Osgood's testimony and the Taser Report create a genuine issue of material fact as to the circumstances of the third taser burst.  Pursuant to the rule in *Forbes*, I will now specifically discuss the disputed facts.  When viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find the third taser activation occurred while Mr. Waters was already secured and handcuffed.  Defendants Osgood and Holl only remember witnessing the first two taser activations.  (D.I. 76 at A98, A153-A154).  While

Defendant Osgood could not be completely sure another burst didn't occur (*Id.* at A98), nothing in his testimony indicates the third burst occurred while he and Defendant Holl were securing Mr. Waters. (*Id.* at A95). Rather, Defendant Osgood specifically stated no taser cycle was active when Mr. Waters was in the process of being handcuffed. (*Id.*).

Defendants Osgood and Holl were already extremely close – approximately two feet away – to Mr. Waters during the second taser deployment and secured him in "five to ten seconds" from the time they first put their hands on him. (*Id.* at A94, A151). Understanding the third taser activation occurred fifteen seconds after the second burst ended, a reasonable jury could conclude Mr. Waters was secured before the third taser activation occurred. (D.I. 83 at PA36). No Defendant has testified Mr. Waters was struggling or fighting after any taser burst, let alone after the second burst. Thus, a reasonable jury could conclude it was unreasonable for Defendant McCann to activate a taser on "an individual who is nonviolent, compliant, and poses no threat of danger." *Randolph-Ali*, 793 F. App'x at 150. It is for the jury to weigh the circumstantial evidence and timeline created by the testimony of Defendants Osgood and Holl against Defendant McCann's recollection of the third taser burst.

Pursuant to the rule in *Grant*, the excessive force claim against McCann survives consideration of qualified immunity, because there is no dispute that Defendant McCann was personally responsible for the taser activations.

Summary judgment is therefore denied as to the excessive force claim against Defendant McCann.

### 2. False Arrest Claim

A claim for false arrest under the Fourth Amendment requires a plaintiff to establish "(1) there was an arrest; and (2) the arrest was made without probable cause." *Grubbs v. Univ. of*

*Del. Police Dep't*, 174 F. Supp. 3d 839, 852 (D. Del. 2016).  "[P]robable cause exists if there is a fair probability that the person committed the crime at issue."  *Dempsey v. Bucknell Univ*., 834 F.3d 457, 467 (3d Cir. 2016) (citations, internal quotation marks, and alterations omitted).

Plaintiff notes a court must analyze the "totality of the circumstances" to determine if an arrest was made.  *United States v. King*, 243 F. Supp. 3d 488, 498 (D. Del. 2017), *aff'd,* 764 F. App'x 266 (3d Cir. 2019).  Plaintiff argues that the facts here demonstrate Mr. Waters was formally arrested.  (D.I. 82 at 12).  Plaintiff asserts that Defendants' use of a taser and handcuffs on Mr. Waters are all hallmarks of a formal arrest.  *Id*.

In arguing that there was not probable cause, Plaintiff asserts that Defendants "fail to offer any criminal statute that would cover (1) refusing a request to enter one's home, (2) truthfully denying a false identity, or (3) lawful possession of a firearm in one's home."  (*Id*. at 13).[2]  Plaintiff further contends there are genuine issues of material fact as to whether the mistaken identity committed by Defendants was reasonable.  *See Diaz v. Bullock*, 268 F. Supp. 3d 640, 648 (D.N.J. 2017) (citing *Hill v. California*, 401 U.S. 797, 802, (1974) (explaining that in cases of mistaken identity, an officer cannot receive qualified immunity unless (1) there was probable cause to arrest the true target, and (2) the mistake was reasonable).

Defendants contend the record does not support a finding that Defendants actually arrested Mr. Waters,[3] and even if they did, the detention was proper.  (D.I. 75 at 16).  "Police officers may arrest individuals if the officer has probable cause to believe that the individual has committed a crime."  *Stafford v. State*, 59 A.3d 1223, 1228 (Del. 2012).  Based on the situation, Defendants argue the "facts and circumstances clearly warrant a person of reasonable caution

---

[2] The identification of Aggravated Menacing as the relevant crime was made after Plaintiff made this argument.  (*See* D.I. 95).
[3] At oral argument, Defendants conceded that Mr. Waters had been detained.

believing that an offense had been committed."  (D.I. 75 at 16).  Specifically, Defendants

contend they had probable cause to believe Mr. Waters committed aggravated menacing.  11

*Del. C.* § 602.  Aggravated menacing occurs when a person displays "what appears to be a

deadly weapon" and intentionally "places another person in fear of imminent physical injury."

*Id*.  Based on the undisputed fact that Mr. Waters was in possession of a deadly weapon that he

refused to drop, and that Defendants reacted by all three drawing their guns, Defendants argue

probable cause existed here.  (D.I. 95 ¶ 7).

Further, Defendants argue "the officers are at a minimum entitled to qualified immunity

because no clearly established case law prohibits the arrest of a subject under these

circumstances and the officers were of the good faith belief that they were arresting Wilson, who

had an active warrant."  (D.I. 75 at 16-17).  Defendant Holl, who had interacted with Mr. Wilson

and Mr. Waters three months previously, believed the individual to whom he was speaking was

Mr. Wilson.  (D.I. 76 at A142, A146).  Defendant Osgood also remembers Defendant Holl

saying "that's the guy we're looking for" when the officers were speaking to Mr. Waters.  (*Id.* at

A81).  Defendant McCann stated they "were calling him Mr. Richard because . . . that's who we

thought [Mr. Waters] was."  (*Id.* at A19).

In my opinion, Defendants had probable cause to arrest Mr. Waters for Aggravated

Menacing, and thus I do not need to consider whether it was reasonable for them to believe that

he was the person for whom they had the arrest warrant.  In the alternative, Defendants are

entitled to qualified immunity.

For probable cause, the crime of aggravated menacing has three essential elements: (1)

the defendant displayed what appeared to be a deadly weapon; (2) in doing so, the defendant

placed another person in fear of imminent physical injury; and (3) the defendant acted

intentionally. *State v. Thomas*, 2015 WL 13697677 (Del. Super. Ct. Sept. 24, 2015), *aff'd*, 138 A.3d 1151 (Del. 2016). There is no dispute here that Mr. Waters was in possession of a deadly weapon. While Mr. Waters was not directly pointing the gun at any of the Defendants, the Delaware Supreme Court has previously held it is not necessary for a defendant to directly point a gun at the victim to be convicted of aggravated menacing. *See Cuff v. State*, 792 A.2d 188, 2002 WL 384438 at *1 (Del. 2002); *see also State v. Thomas*, 2015 WL 13697677 at *1-2 (Del. Super. Ct. Sept. 24, 2015), *aff'd*, 138 A.3d 1151 (Del. 2016). While it may not be completely clear if Mr. Waters actually intended to cause fear of imminent physical injury, that is a reasonable inference from the fact that after the interaction with the officers seemed to be over, Mr. Waters came to the door and announced he had a gun, which he then refused to drop when commanded to do so. And, in regard to fearing imminent physical injury, Defendants' reactions convey in a manner that words do not that they so feared. *See Cuff*, 792 A.2d 188, 2002 WL 384438 at *1 (analyzing the reaction of the individual to show fear of imminent physical injury). Further, even when the defendant did not point the weapon at officer, the Delaware Supreme Court has held that "it is a natural and probable result that a police officer, while pursuing a suspect, would fear being shot when that suspect pulls out a gun."[4] *Belmont v. State*, 181 A.3d 632, 2018 WL 1176623 at *3 (Del. 2018). Although given the opportunity to analyze Delaware law on the applicability of Aggravated Menacing to the set of facts here, Plaintiff does not cite to any case law that would demonstrate probable cause did not exist in this situation. (D.I. 100).

It is likely this case falls somewhere in between *Cuff* and *Belmont*. Here, the officers have not explicitly stated that they felt fear of imminent injury, as was the case in *Belmont,* 181

---

[4] The Defendants thought that Mr. Waters was Mr. Wilson. While the reasonableness of that belief is subject to debate, it would be fair to characterize Mr. Waters as a "suspect" in light of that belief.

A.3d 632, 2018 WL 1176623 at *1 (acknowledging that Officer Tynes testified, "I felt my life was in danger"). However, as in *Cuff*, the officers' reactions could also demonstrate the fear of imminent physical injury. *See Cuff*, 792 A.2d 188, 2002 WL 384438 at *1. Further, as in this case, the defendant in *Cuff* never actually removed the gun from this pants. *Id*. However, the defendant in *Cuff* appeared to threaten the individual with the gun. *Id*. Here, Defendants have not testified that Mr. Waters ever directly threatened them. Thus, any gray area or uncertainty about probable cause that may exist here does not strip the officers of their qualified immunity. *See Williams v. City of York, Pennsylvania,* 2020 WL 4249437 at *9. Rather, it "insulates" them from liability. *Id*. Summary judgment is therefore granted for all Defendants as to the false arrest claim.

### 3. Deliberate Indifference to Medical Needs

A deliberate indifference to the medical needs of an individual who is injured while being apprehended by the police violates the person's Fourteenth Amendment right to due process. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *see Smith v. Gransden*, 553 F. App'x 173, 177 (3d Cir. 2014). The due process rights of an arrestee are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. at 244. The analysis is similar to an Eighth Amendment analysis. A plaintiff alleging deliberate indifference to a medical needs violation of the Fourteenth Amendment right to due process "must show (1) a serious medical need, (2) acts or omissions by law enforcement officials that indicate deliberate indifference to that need, and (3) a causal connection between the indifference and the plaintiff's injury." *Gransden*, 553 F. App'x at 177 (cleaned up) (quoting in part *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) and *Miller v. City of Phila.,* 174 F.3d 368, 374 n.5 (3d Cir. 1999)). "Deliberate indifference is a subjective

standard of liability consistent with recklessness as that term is defined in criminal law."
*Gransden*, 553 F. App'x at 177 (cleaned up) (quoting *Natale*, 318 F.3d at 582).

The Supreme Court has recently applied an "objectively unreasonable" standard to
analyze an excessive force claim under the Fourteenth Amendment. *Kingsley v. Hendrickson*,
576 US 389, 398 (2015). However, the Third Circuit has declined to address whether the
"objectively unreasonable" standard applies to a deliberate indifference to medical need analysis.
*Moore v. Luffey*, 2019 WL 1766047 at *3 n.2 (3d Cir. Apr. 19, 2019).

Defendants argue they are entitled to qualified immunity for the deliberate indifference to
medical need claim. (D.I. 75 at 17). Defendants explain that screaming was heard in the house
after using the taser on Mr. Waters. *Id*. This prompted the troopers to perform a security sweep
of the house. *Id*. Defendants note that, at that time, Mr. Waters was not in any apparent distress.
(D.I. 76 at A29). Once anyone noticed Mr. Waters was having trouble breathing, Defendants
argue there was no deliberate indifference to medical care. (D.I. 75 at 15). Defendant McCann
rolled Mr. Waters into a "recovery position" to assist breathing, radioed for an ambulance, and
administered at least one automatic external defibrillator shock to Mr. Waters. (D.I. 75 at 15-16;
D.I. 76 at A29-A31).

Plaintiff asserts that Defendants are not challenging the first element (serious medical
need) because "such a challenge would be futile." (D.I. 82 at 15). A medical need is serious
under this test if it is "so obvious that a lay person would easily recognize the necessity for a
doctor's attention." *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.
1987) (quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J.1979)). Plaintiff argues here,
"Waters' struggle, and ultimate failure to breathe, as well as his cardiac arrest, were noticed by
all of the Defendant Officers." (D.I. 82 at 15). Thus, Plaintiff asserts the first element of

seriousness is met as a lay person would have easily recognized the necessity for a doctor's attention. *Id*. Indeed, Defendants do not challenge that this element is met.

For the second element, Plaintiff argues that while Defendants were immediately aware of the medical needs, they "appeared to have simply ignored these warning signs. (*Id*. at 16). Plaintiff contends that Defendant McCann merely stood with Mr. Waters while the other troopers swept the house and appeared to have taken steps that would have slowed the arrival of any lifesaving help by advising the EMTs that it was too dangerous to proceed to the scene. (D.I. 82 at 16; *see* D.I. 77 at A188). While the troopers may have administered CPR and used the AED, Plaintiff argues effective treatment did not actually start until the paramedics arrived because Mr. Waters remained handcuffed with his hands behind his back during this process. (D.I. 82 at 16; *see* D.I. 76 at A99 (Mr. Waters was on his back when chest compressions began), A179 (Mr. Waters was handcuffed when chest compressions began)). Thus, Plaintiff asserts Defendants "engaged in the very type of conduct which has long been recognized as qualifying as deliberately indifferent."[5] (D.I. 82 at 17).

Plaintiff's argument does not support a finding of deliberate indifference to medical need. After Mr. Waters was handcuffed, Defendant Osgood noticed Mr. Waters was making "snoring" noises but didn't "remember looking" to check his breathing as that wasn't something he was "paying attention to." (D.I. 76 at A95). Prior to leaving Mr. Waters to check the basement, Defendant McCann believed Mr. Waters' breathing was "normal" but could not remember exactly. (*Id*. at A29). Further, Defendants Holl and Osgood immediately went to clear the house after Mr. Waters was handcuffed due to the screaming heard inside. (*Id*. at A96, A152). After

---

[5] None of the cases cited in Plaintiff's brief (D.I. 82) support the proposition. Plaintiff cites cases involving prison administrators dealing with non-emergencies and/or no care at all.

taking approximately two minutes to clear the house, Defendant Holl noticed CPR was being performed on Mr. Waters and an ambulance was called.  (*Id*. at A152-153).

      This testimony indicates none of the Defendants observed Mr. Waters to be in need of serious medical assistance before sweeping the house.  When Defendant McCann returned from sweeping the basement, he noticed Mr. Waters was having difficulty breathing and along with other officers at the scene, administered first aid.  (*Id*. at A29-31).  An ambulance was radioed for, and Defendant McCann administered at least one AED shock to Mr. Waters.  *Id*.  Plaintiffs do not provide evidence that demonstrates any of the Defendants actually noticed there was a serious medical problem and took no action.  Any mistakes made during care are more relevant for a negligence claim, not a deliberate indifference claim.  *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) ("It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute deliberate indifference") (internal quotation marks omitted).

      The Delaware Police Taser Use Policy states that if "the subject has received three (3) or more activations of the CEW, the employee shall seek medical treatment for the subject immediately."  (D.I. 83 at A28).  However, Defendant McCann requested an ambulance one minute after deploying his taser, and most of the intervening minute was occupied with the second and third taser deployments.  He did seek medical treatment immediately.  Thus, the Taser Use Policy was followed, and, since it was complied with, it does not support any finding of deliberate indifference.  While Defendant McCann did have the ambulance "stage" for approximately four minutes,[6] the undisputed record demonstrates all Defendants heard

---

[6] The timeline per the dispatch records (D.I. 77 at A188) is:
10:34:26 subject advises he has a weapon will not show his hands
10:35:50 taser deployment

screaming inside the house and were forced to conduct a sweep.  (*See* D.I. 77 at A188; D.I. 76 at

A97, A151).  A brief delay in treatment, without some more culpable state of mind, is not

deliberate indifference.

Even under an objectively unreasonable standard, Plaintiff's argument fails.  This

standard still requires the plaintiff to show that the defendant was more than negligent,

something more akin to "reckless disregard."  *Moore v. Luffey*, 2019 WL 1766047 at *3 n.2

(quoting *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).  The record does

not indicate any reckless disregard of Mr. Waters' medical condition by Defendants.[7]  Thus,

---

10:36:41 request additional units
10:36:50 request A 44
10:38:06 S1344 advises have the 44 stage
10:42:20 S1344 advises 10-1 for 44
10:42:46 subject unconscious but breathing
10:43:59 S1344 advises 10-1 with what units they have on scene now
10:44:31 S1344 advises need 44 10-18
10:45:50 CPR in progress
Put into more of a narrative form, Mr. Waters advised he had a weapon. One minute, twenty-four seconds later, McCann tasered him.  One minute after that, an ambulance ("A 44") was requested.  One minute, sixteen seconds later, McCann asked that the ambulance be "staged," that is, wait until it was safe to enter the scene.  Four minutes, fourteen seconds after that, the scene is safe for the ambulance.  Twenty-six seconds later, Mr. Waters is unconscious but breathing.  One minute, forty-five seconds later, McCann requests that the ambulance get there as quick as possible.  One minute, nineteen seconds later, CPR is in progress.  I am unclear on the exact accuracy of the dispatch records.  According to the Taser's records, the initial deployment as at 10:35:31 rather than 10:35:50. (D.I. 83 at A36).

[7] The case for deliberate indifference to medical needs against Defendants Osgood and Holl is virtually nonexistent.  Both went off to do a security sweep immediately after Mr. Waters was secured, and other officers took responsibility for trying to assist Mr. Waters when he was in distress.  Osgood and Holl are essentially included as defendants simply because they were there. *Cf. Williams v. City of York, Pennsylvania*, __ F.3d __, 2020 WL 4249437 at *3 (July 24, 2020) (a "plaintiff alleging that one or more officers engaged in unconstitutional conduct must establish the 'personal involvement' of each named defendant to survive summary judgment and take that defendant to trial").

Defendants' motion for summary judgment is granted for the deliberate indifference to medical need claim.[8]

### B. Battery Claim

Under Delaware law, "The tort of battery is the intentional, unpermitted contact upon the person of another which is harmful or offensive." *Grubbs,* 174 F. Supp. 3d at 860 (quoting *Hunt ex rel. DeSombre v. State, Dep't of Safety & Homeland Sec., Div. of Del. State Police*, 69 A.3d 360, 368 (Del. 2013)).

Plaintiff alleged the battery claim against all three Defendants in the Amended Complaint. (*See* D.I. 68 ¶ 119). However, in the answering brief, Plaintiff appears to concede the battery claim only applies against Defendant McCann. (*See* D.I. 82 at 17). This is consistent with the record that demonstrates only Defendant McCann activated his taser. Summary judgment on the battery claim is therefore granted toDefendants Osgood and Holl.

Defendants argue, "[T]he record suggests that the use of the Taser was a good faith attempt to resolve a tense, potentially deadly situation in a less than lethal manner." (D.I. 75 at 18). Defendants further note that under Delaware law, 11 Del. C. § 467, "the officers were permitted to use reasonable force that was necessary to arrest Waters, who was threatening them with a gun and refusing to drop his weapon." (D.I. 75 at 18).

Plaintiff notes it cannot be contested that the contact was intentional and harmful. (D.I. 82 at 17). For "unpermitted," Plaintiff contends that "if McCann's use of force was ever necessary, it ceased to be necessary once Osgood and Holl had already subdued a twice-tased

---

[8] While I do not think Defendant McCann needs to be considered for qualified immunity on this claim, I think the fact that Plaintiff's argument seems to turn on distinctions such as whether Mr. Waters was handcuffed behind his back or not indicates that the constitutional right being considered is not whether he had a clearly established right to medical treatment, but whether he had a clearly established right to a particular method of medical treatment, to which I think the answer is no.

and compliant Waters." *Id*.  Plaintiff asserts the evidence demonstrates the arrest of Waters had already concluded before McCann's final activation of his taser.  (*Id*. at 18).  Thus, he could not have believed such force was reasonably necessary.  *Id*.

For reasons previously discussed, a genuine issue of material fact remains as to the circumstances and reasonableness of the third taser burst.  A reasonable jury could find the third taser burst satisfied all elements of a battery claim.  Thus, summary judgment is denied for the battery claim against Defendant McCann.

### C.  Gross or Wanton Negligence

To demonstrate gross negligence, a plaintiff must demonstrate "a higher level of negligence representing an extreme departure from the ordinary standard of care."  *Smith v. Angelo*, 2017 WL 2276985 at *10 (D. Del. 2017) (citation and internal quotations omitted). Gross negligence requires a finding that a defendant was "deliberately indifferent to a known or obvious risk*." Key v. Brewington-Carr*, 2000 WL 1346688 at *30 (D. Del. 2000) (*citing Barrie v. Grand County*, 119 F.3d 862, 869 (10th Cir. 1997)).

Defendants once again emphasize that their conduct was reasonable under the circumstances.  (D.I. 75 at 18).  They contend using a taser to "defuse a situation involving a subject refusing to obey orders to drop a gun is reasonable and is not a departure from the ordinary standard, let alone an extreme departure."  *Id*.  Defendants assert detaining and arresting an armed suspect who confronted officers and refused to drop his weapon is also reasonable and not an extreme departure.  *Id*.  Further, Defendants argue the medical care provided was not an extreme departure and was at most, simple negligence.  (*Id*. at 19-20).

Plaintiff asserts, "[T]he evidence in the case at bar, when viewed in the light most favorable to the Plaintiff, raises genuine issues of material fact as to the excessive force

employed by McCann and the deliberate indifference displayed by all the Defendant Officers to Waters's medical condition." (D.I. 82 at 18).

The Delaware Supreme Court has stated, "Ordinarily, questions of gross negligence and willful or wanton conduct are for the jury and are not susceptible of summary adjudication." *Brown v. United Water Del., Inc.*, 3 A.3d 272, 276 (Del. 2010). So too here. For the same reasons previously discussed, a genuine issue of material fact remains as to the circumstances and reasonableness of the third taser activation.

As for any questions of negligence regarding the medical care provided by Defendants, there is no evidence of negligence by Defendants Holl and Osgood. As to Defendant Holl, no testimony indicates that he was ever involved in the medical care. After returning from sweeping the house, Defendant Holl stated there were multiple people on scene and observed that CPR had already started to be performed on Mr. Waters before he arrived. (D.I. 76 at A153). Defendant Holl did not perform CPR or provide any medical care. *Id.* Similarly, Defendant Osgood was watching the medical aid being performed. (*Id.* at A99). There is no testimony that Defendant Osgood actually administered CPR or an AED shock. Rather, it was Corporal Rodrigues and Trooper Nefosky that were performing the allegedly negligent CPR. (*Id.* at A99). Any duty that Defendants Osgood and Holl owed to Mr. Waters was assumed by the officers who actually provided the medical care. Summary judgment on the gross or wanton negligence claims is therefore granted to Defendants Osgood and Holl.

For Defendant McCann, a reasonable jury could find that he owed a duty to Mr. Waters based on the Delaware State Police Taser Use Policy. (D.I. 83 at A28). This policy states that if "the subject has received three (3) or more activations of the CEW, the employee shall seek medical treatment for the subject immediately." (*Id.* at A28). But since the undisputed evidence

is that Defendant McCann sought medical treatment about as immediately as he could have, a reasonable jury could not find Defendant McCann was grossly negligent in that regard.  (D.I. 77 at A188).

There is a question about the medical treatment provided between the call for an ambulance and the ambulance's arrival.  Defendant points out that Defendant McCann "was a certified Taser instructor" and knew about the risks of using a Taser.  (D.I. 83 at A49).  The risks included having a cardiac event.  Plaintiff's well-qualified expert interprets the evidence as, Defendant McCann "abandon[ed] his patient [and] fail[ed] to recognize and act in a timely manner to Mr. Waters' medical emergency."  (*Id.* at A54).  Whether Defendant McCann was grossly or wantonly negligent appears to involve disputed material facts.  Thus, summary judgment on the gross or wanton negligence claims are denied for Defendant McCann.

### D.  Plaintiff's Motion to Exclude Defendants' Police Policy Experts

The purpose of testimony of an expert witness is to assist the trier of fact in understanding the evidence or determining a fact.  Fed. R. Evid. 702.  This is primarily a relevance inquiry. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993). Expert testimony that mandates a legal conclusion is not permitted.  *Watkins v. New Castle County*, 374 F. Supp. 2d 379, 393 (D. Del. 2005) (citing *Salas by Salas v. Wang*, 846 F.2d 897, 905 n.5 (3d Cir. 1988)).  In a similar context that involved an expert witness for a § 1983 excessive force claim, the Third Circuit stated, "expert testimony becomes impermissible if the expert's opinion would interfere with the district court's pivotal role in explaining the law to the jury."  *Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013) ("In his testimony, Baranowski essentially opined that Deputy Moorman's actions were unreasonable and about what a reasonable officer would have done. In a § 1983 suit, 'reasonableness' is practically

interchangeable with 'excessiveness', so Baranowski might as well have opined that Deputy

Moorman's use of force was excessive)."

Plaintiff argues that Defendants' police policy experts, Mr. Steve Ijames and Mr. Joseph

Stine, should not be permitted to testify at trial.  (D.I. 79, D.I. 87).  Specifically, Plaintiff notes

that in Mr. Stine's report, the phrase "generally accepted practices and procedures for

professional law enforcement officer" is used eighteen times without stating what these practices

or procedures are or providing any other basis for the statements.  (D.I. 79 at 14).  Mr. Ijames

offers similar testimony throughout his opinion, concluding many of Defendants' actions were

consistent with generally accepted police policy and procedure.  (*Id*. at 3; *see* D.I. 80, Ex. 1 at 2-

9).  Plaintiff argues that "saying something was consistent with 'contemporary police training,

policy, and practice' is interchangeable with saying that it was reasonable, and that is essentially

telling the jury how they should rule."  (D.I. 87 at 2-3).  Plaintiff further asserts that the witnesses

are essentially offering testimony on the same issue, so both should not be allowed to testify.

(*Id*. at 4).

Defendants concede that any comments related to reasonableness must be avoided.  (D.I.

84 at 1).  However, Defendants argue the expert witnesses should still be able to opine that the

actions were consistent with contemporary training and practice.  (*Id*. at 2).  For Plaintiff's

assertion that the experts do not explain their reasoning, Defendants contend this should be the

basis for "tough cross-examination questions."  (*Id*. at 2 n.2).  Further, Defendants argue both

witnesses should be able to testify because they each speak to different issues. (*Id*. at 2-3)

(explaining Mr. Ijames has more experience with taser use while Mr. Stine speaks to accepted

police practices that include the service of the warrant and drawing of handguns).

I am persuaded in part by Plaintiff's argument.  It is not helpful for Defendants' experts to merely say the conduct is consistent with generally accepted practices and procedures.  Rather, the experts should explain these generally accepted practices and procedures.  It is for the jury to decide whether Defendants' actions were consistent.  Expert testimony may not mandate a legal conclusion.  *Watkins,* 374 F. Supp. 2d at 393.  Similarly, in a previous case with excessive force violations, Mr. Ijames provided testimony that the force used by officers "was consistent with generally accepted police training and practice, proportional to the resistance put forth, not likely to result in serious or permanent injury, and within the standards of a reasonable, prudent, and properly trained police officer facing similar circumstances." *Alberternst v. Hunt*, 2011 WL 6140888 at *6 (E.D. Mo. Dec. 9, 2011).  The court refused to "allow Mr. Ijames, either by his report or his testimony at trial, to offer any legal conclusions which either explicitly or implicitly touch on the ultimate legal issue in this case, that is, whether Defendants' conduct was reasonable under the totality of the circumstances they faced." *Id.*  As is the case here, the experts may not merely state the officers' actions are "consistent" with these generally accepted policies and practices because it implicitly touches on the reasonableness aspect.

However, I do not accept Plaintiff's argument that both experts should necessarily be excluded from testifying.  The experts in part address different issues, and their purported expertise is different.   While it is true that the practice of this Court is not to permit a party to offer duplicative expert testimony, simply because both experts are described as "police practices" experts does not mean that only one of them will be permitted to testify.  To the extent there is overlap, that is a subject for either or both motions in limine and objections at trial, not a *Daubert* motion.  Plaintiff's motion to exclude Defendants' experts is denied, with leave to revisit the issue before trial and after any revised expert reports are produced.

Defendants' expert reports need to comply with the Federal Rules.  I do not think they do.

*See* Fed. R. Civ. P. 26(a)(2)(B).  An expert report must include "(i) a complete statement of all

opinions the witness will express and the basis and reasons for them; (ii) the facts or data

considered by the witness in forming them; [and] (iii) any exhibits that will be used to

summarize or support them."  Here, while the experts quote and/or summarize what Defendants

stated about the events at issue, the meat of the opinions is that what the officers did "was

consistent with contemporary police training, policy and practice," usually with no explanation at

all about what "contemporary police training, policy and practice" is other than what can be

inferred from the description of what Defendants said they did.  Indeed, it would not be unfair to

argue that each of the expert's reports could have been one sentence: "Everything the officers

say they did is consistent with contemporary police practices and training."  This is not an

adequate disclosure.  If the experts are going to be of any help to the jury, it will be from their

description of contemporary police training, policy and practice, of which there is essentially no

disclosure.

Defendants are granted leave to amend their expert witness reports and serve revised

expert reports within twenty-one days.  This will allow the experts to describe proper police

practices and procedures with evidence to support these descriptions, rather than the conclusory

statements present in the reports now.

## IV.     SUMMARY

Defendants' motion for summary judgment is granted for the deliberate indifference to

medical need and false arrest § 1983 claims, and, as to Defendants Osgood and Holl, for the

excessive force § 1983 claim and the state law claims for battery and gross or wanton

negligence.  Summary judgment is denied for the excessive force § 1983 claim and for the state

law claims of battery and gross or wanton negligence against McCann.  Plaintiff's motion to exclude Defendants' expert witnesses is denied, but the expert reports are struck.  Defendants are granted leave to amend their expert witness reports, within twenty-one days.

A separate order will be entered.

 /s/ Richard G. Andrews    
United States District Judge

August 5, 2020